

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00691-CV

_____

JILL MORPHIS, SHILA BORCHERT, TOMMY HUNTER, JENNIE FLAA, AND
MIKE PICHA, Appellants

V.

JUSTIN WALTON AND MARIAH WALTON, A/N/F P.W., Appellees

On Appeal from the 467th District Court
Denton County, Texas
Trial Court No. 25-11727-467

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Sanger Independent School District employees Jill Morphis, Shila Borchert, Tommy Hunter, Jennie Flaa, and Mike Picha (the ISD Employees) appeal from a trial court order denying their plea to the jurisdiction in a suit filed by Justin and Mariah Walton, the parents of a Sanger ISD student who allegedly had been subjected repeatedly to verbal threats by another Sanger ISD student who attended the same school and rode the same bus. In three issues, the ISD Employees contend that the trial court erred by denying their plea to the jurisdiction because (1) the Waltons failed to exhaust their administrative remedies before filing suit, (2) the ISD Employees' immunity from suit for the Waltons' ultra vires claim has not been waived, and (3) the trial court's order requiring the ISD Employees to complete a threat assessment is not relief envisioned by the Uniform Declaratory Judgments Act (UDJA). We reverse the trial court's order and dismiss the Waltons' suit for want of jurisdiction.

## II. BACKGROUND

The Waltons sued the ISD Employees in November 2025, claiming that the ISD Employees had failed to comply with ministerial duties imposed by Section 37.115 of the Texas Education Code and the Sanger ISD Board Policy Manual "after being informed of 'harmful, threatening or violent behavior'"[1] toward

---

[1] For readability, the record quotations in this memorandum opinion omit formatting in the original, such as boldface type and underlining.

their daughter (Paula)[2] "including verbal threats, such as threats to kill [her]; threats of the use of a weapon, such as statements about knowing where guns are; [and] harmful statements, such as telling a[] student to kill" herself. They alleged that another elementary-school student (David) had been threatening to harm their daughter for at least two years and that the ISD Employees had been aware of the threats since they had begun but had failed to take sufficient steps to secure Paula's safety as required by law and Sanger ISD policy.

The Waltons sought a temporary restraining order and temporary injunction seeking (1) to have David temporarily removed from the elementary-school campus, (2) to not allow David on any Sanger ISD buses, and (3) to prohibit David from attending any of the elementary school's events or school-sponsored events. The Waltons also sought a declaration that the ISD Employees had failed to carry out their ministerial duties according to Texas Education Code Section 37.115 and the Sanger ISD Board Policy Manual. Further, the Waltons sought attorney's fees.

The ISD Employees filed a plea to the jurisdiction alleging (1) that the Waltons had failed to exhaust their administrative remedies by failing to first seek relief from the Texas Commissioner of Education, (2) that each of the ISD Employees is entitled to governmental immunity from the Waltons' claims as pleaded,[3] and (3) that the

---

[2]In this memorandum opinion, we use aliases to refer to minors. *See generally* Tex. R. App. P. 9.9(a)(3).

[3]The ISD Employees did not challenge the existence of jurisdictional evidence.

Waltons lacked standing to seek injunctive relief that infringes upon a third-party student's right to attend school and school events. The Waltons filed a response, in which they contended that they were not required to exhaust their administrative remedies before filing suit because "[t]he immediate threats to [Paula's] safety constitute irreparable harm that cannot adequately be addressed through administrative procedures." They also argued that they had properly pleaded ultra vires claims against the ISD Employees, for which immunity is waived, because Education Code Section 37.115 "creates specific, non-discretionary duties regarding threat assessment and student safety that [the ISD Employees] allegedly failed to perform after being informed of threatening behavior."

After a hearing at which the trial court considered the plea to the jurisdiction and the Waltons' claim for declaratory relief, the trial court denied the ISD Employees' plea to the jurisdiction and ordered the ISD Employees "to perform a threat assessment, no later than seven business days from the date of th[e] order, of each threat made by [David] during the 25-26 school year against [Paula] in compliance with Sanger Independent School District's Threat Assessment Procedures."[4] The ISD Employees appealed. At the ISD Employees' request, we stayed all trial court-proceedings while considering this appeal.

---

[4]Attached to and incorporated into this order are two documents that do not appear anywhere else in the record: a document entitled "Threat Assessment Procedures" and a two-page flow chart detailing the threat assessment process. Both contain internal references to Sanger ISD.

## III. DISCUSSION

Because it is dispositive,[5] we first consider the ISD Employees' contention that the Waltons did not plead sufficient facts showing a waiver of governmental immunity because they failed to plead a proper ultra vires claim.

### A. Standard of Review

We review de novo a trial court's jurisdictional ruling. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

When a defendant challenges whether the plaintiff has alleged facts sufficient to waive immunity, as the ISD Employees have here, we liberally construe the pleadings in the plaintiff's favor, considering all factual assertions to be true and looking to the plaintiff's intent. *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020). Even under that liberal construction, the plaintiffs must demonstrate, through the facts alleged in their live pleading, that immunity from suit has been waived. *Doe v. City of Fort Worth*, 646 S.W.3d 889, 897 (Tex. App.—Fort Worth 2022, no pet.); *see Walker Cnty. ESD No. 3 v. City of Huntsville*, 658 S.W.3d 807, 816 (Tex. App.—Waco 2022, pet. denied) (explaining that court must apply facts alleged in pleadings to

---

[5]A disposition in the ISD Employees' favor on any of their issues would result in the same disposition: dismissal for want of jurisdiction. *See, e.g.*, *Image API, LLC v. Young*, 691 S.W.3d 831, 836 n. 20 (Tex. 2024) (noting that proper remedy for improper ultra vires claim is dismissal for lack of jurisdiction); *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 545–46, 560 (Tex. 2016) (noting same for exhaustion of administrative remedies); *Sealy RG Valley Bldgs., L.P. v. Griffin*, No. 13-07-598-CV, 2008 WL 3906408, at *2 (Tex. App.—Corpus Christi–Edinburg Aug. 26, 2008, no pet.) (mem. op.) (holding same when relief not available under UDJA).

relevant statutory provisions to determine whether plaintiff pleaded ultra vires claim). Conclusory allegations alone will not suffice. *See Casper v. Tex. Woman's Univ.*, No. 02-22-00345-CV, 2023 WL 5617129, at *14 (Tex. App.—Fort Worth Aug. 31, 2023, pet. denied) (mem. op.).

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but also do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be allowed to amend. *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007); *Miranda*, 133 S.W.3d at 226–27.

School-district employees sued in their official capacities do not have immunity from suit for properly pleaded ultra vires claims. *Arlington Indep. Sch. Dist. v. Williams*, No. 02-23-00142-CV, 2023 WL 8643040, at *3 & n.3 (Tex. App.—Fort Worth Dec. 14, 2023, no pet. [mand. denied]) (mem. op.); *see Franka v. Velasquez*, 332 S.W.3d 367, 383 (Tex. 2011) (explaining that ultra vires claims may be brought against government employees). A valid ultra vires claim must show that an employee failed to perform a purely ministerial act or acted outside the employee's discretionary authority. *Jones v. Turner*, 646 S.W.3d 319, 325 (Tex. 2022); *see Houston Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). Although school-district employees generally have no discretion to misinterpret the law, "an act within [the employee's] discretion is protected by immunity even if it is erroneous." *Jones*, 646 S.W.3d at 325.

To avoid a dismissal for want of jurisdiction on an ultra vires claim, a plaintiff must "allege facts affirmatively demonstrating actionable ultra vires conduct by state officials." *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021). The Texas Supreme Cout has noted that "[i]n an ultra vires case, 'the jurisdictional inquiry and the merits inquiry are [often] intertwined.'" *Image API, LLC*, 691 S.W.3d at 836 n.15 (quoting *Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 345 (Tex. 2019)).

## B. Education Code Section 37.115

The Waltons contend that the ISD Employees violated their ministerial duties under Texas Education Code Section 37.115 and the Sanger ISD Board policy promulgated pursuant to that section. To understand the gist of their petition in relation to the statute, it is necessary to recite most of Section 37.115:

(a) In this section:

(1) "Harmful, threatening, or violent behavior" includes behaviors, such as verbal threats, threats of self harm, bullying, cyberbullying, fighting, the use or possession of a weapon, sexual assault, sexual harassment, dating violence, stalking, or assault, by a student that could result in:

(A) specific interventions, including mental health or behavioral supports;

(B) in-school suspension;

(C) out-of-school suspension; or

(D) the student's expulsion or removal to a disciplinary alternative education program or a juvenile justice alternative education program.

7

(2) "Team" means a threat assessment and safe and supportive school team established by the board of trustees of a school district under this section.

(b) The agency,[6] in coordination with the Texas School Safety Center, shall adopt rules to establish a safe and supportive school program. The rules shall incorporate research-based best practices for school safety, including providing for:

(1) physical and psychological safety;

(2) a multiphase and multihazard approach to prevention, mitigation, preparedness, response, and recovery in a crisis situation;

(3) a systemic and coordinated multitiered support system that addresses school climate, the social and emotional domain, and behavioral and mental health; and

(4) multidisciplinary and multiagency collaboration to assess risks and threats in schools and provide appropriate interventions, including rules for the establishment and operation of teams.

(c) The board of trustees of each school district shall establish a threat assessment and safe and supportive school team to serve at each campus of the district and shall adopt policies and procedures for the teams. The team is responsible for developing and implementing the safe and supportive school program under Subsection (b) at the district campus served by the team. The policies and procedures adopted under this section must:

(1) be consistent with the model policies and procedures developed by the Texas School Safety Center;

---

[6]In this section, "agency" refers to the Texas Education Agency. Tex. Educ. Code § 5.001(1).

8

(2) require each team to complete training provided by the Texas School Safety Center or a regional education service center regarding evidence-based threat assessment programs;

(3) require each team established under this section to report the information required under Subsection (k) regarding the team's activities to the agency;

(4) provide for:

(A) a district employee who reports a potential threat to a team to elect for the employee's identity to be confidential and not subject to disclosure under Chapter 552, Government Code, except as necessary for the team, the district, or law enforcement to investigate the potential threat; and

(B) the district to maintain a record of the identity of a district employee who elects for the employee's identity to be confidential under Paragraph (A);

(5) require each district campus to establish a clear procedure for a student to report concerning behavior exhibited by another student for assessment by the team or other appropriate school employee; and

(6) require that, as soon as safe and practicable after an administrator or team for a district campus receives information regarding a threat made against that campus, including through social media, the administrator or team immediately provide to each member of the teaching staff, including teacher's aides, who may be directly affected by the threat notice that includes:

(A) a statement of the existence of the threat;

(B) the nature of the threat; and

(C) any other pertinent details to ensure student and staff safety.

(d)  The superintendent of the district shall ensure, to the greatest extent practicable, that the members appointed to each team have expertise in counseling, behavior management, mental health and substance use, classroom instruction, special education, school administration, school safety and security, emergency management, and law enforcement.  A team may serve more than one campus of a school district, provided that:

  (1)  each district campus is assigned a team; and

  (2)  in serving a particular campus, the team includes the person designated to serve as the campus behavior coordinator under Section 37.0012 for that campus.

. . . .

(f)  Each team shall:

  (1)  conduct a threat assessment that includes:

    (A)  assessing and reporting individuals who make threats of violence or exhibit harmful, threatening, or violent behavior in accordance with the policies and procedures adopted under Subsection (c); and

    (B)  gathering and analyzing data to determine the level of risk and appropriate intervention, including:

        (i)  referring a student for mental health assessment; and

        (ii)  implementing an escalation procedure, if appropriate based on the team's assessment, in accordance with district policy;

  (2)  provide guidance to students and school employees on recognizing harmful, threatening, or violent behavior that may pose a threat to the community, school, or individual; and

  (3)  support the district in implementing the district's multihazard emergency operations plan.

10

(f-1)  Before a team may conduct a threat assessment of a student, the team must notify the parent of or person standing in parental relation to the student regarding the assessment.  In conducting the assessment, the team shall provide an opportunity for the parent or person to:

  (1)  participate in the assessment, either in person or remotely; and

  (2)  submit to the team information regarding the student.

(f-2)  After completing a threat assessment of a student, the team shall provide to the parent of or person standing in parental relation to the student the team's findings and conclusions regarding the student.

. . . .

(h)  On a determination that a student or other individual poses a serious risk of violence to self or others, a team shall immediately report the team's determination to the superintendent and, if the individual is a student, immediately attempt to inform the parent or person standing in parental relation to the student.  The requirements of this subsection do not prevent an employee of the school from acting immediately to prevent an imminent threat or respond to an emergency.

(i)  A team identifying a student at risk of suicide shall act in accordance with the district's suicide prevention program.  If the student at risk of suicide also makes a threat of violence to others, the team shall conduct a threat assessment in addition to actions taken in accordance with the district's suicide prevention program.

. . . .

(j-1)  Materials and information provided to or produced by a team during a threat assessment of a student under this section must be maintained in the student's school record until the student's 24th birthday.

(k)   A team must report to the agency in accordance with guidelines developed by the agency the following information regarding the team's activities and other information for each school district campus the team serves:

(1)  the occupation of each person appointed to the team;

(2)  the number of threats and a description of the type of the threats reported to the team;

(3)   the outcome of each assessment made by the team, including:

(A)  any disciplinary action taken, including a change in school placement;

(B)  any action taken by law enforcement; or

(C)   a referral to or change in counseling, mental health, special education, or other services;

(4)   the total number . . . of, in connection with an assessment or reported threat by the team:

(A) citations issued for Class C misdemeanor offenses;

(B) arrests;

(C) incidents of uses of restraint;

(D) changes in school placement, including placement in a juvenile justice alternative education program or disciplinary alternative education program;

(E)   referrals to or changes in counseling, mental health, special education, or other services;

(F)   placements in in-school suspension or out-of-school suspension and incidents of expulsion;

(G) unexcused absences of 15 or more days during the school year; and

(H) referrals to juvenile court for truancy[.]

. . . .

(l) The commissioner may adopt rules to implement this section.

Tex. Educ. Code § 37.115(a)–(d), (f)–(f-2), (h)–(i), (j-1)–(l). Section 37.115 was enacted in 2019. Act of May 26, 2019, 86th Leg., R.S., ch. 464, § 13, 2019 Tex. Gen. Laws 868, 876–79.

## C. Sanger ISD Board Policy

The Waltons attached to and incorporated into their petition a copy of the Sanger ISD Board's policy implemented pursuant to Section 37.115. Regarding threat assessments, that policy provides, in pertinent part:

> In accordance with those procedures, the threat assessment and safe and supportive team shall conduct threat assessments using a process that includes:
>
> 1. Identifying individuals, based on referrals, tips, or observations, whose behavior has raised concerns due to threats of violence or exhibition of behavior that is harmful, threatening, or violent.
>
> 2. Conducting an individualized assessment based on reasonably available information to determine whether the individual poses a threat of violence or poses a risk of harm to self or others and the level of risk.
>
> 3. Implementing appropriate intervention and monitoring strategies, if the team determines an individual poses a threat of harm to self or others. These strategies may include referral of a student for a mental health assessment and escalation procedures as appropriate.

The policy also provides, in accordance with Subsection (h) of Section 37.115,

13

For a student or other individual the team determines poses a serious risk of violence to self or others, the team shall immediately report to the Superintendent, who shall immediately attempt to contact the student's parent or guardian. Additionally, the Superintendent shall coordinate with law enforcement authorities as necessary and take other appropriate action in accordance with the District's multihazard emergency operations plan.

## D. The Waltons' Petition

The Waltons do not contend in their petition that the Sanger ISD Board failed to implement a threat assessment policy pursuant to Section 37.115, nor do they contend that the Sanger ISD Board threat assessment policy fails to comport with Section 37.115's requirements. Instead, they alleged in their petition that the ISD Employees failed to follow the Board's threat assessment policy by failing to conduct an initial threat assessment in response to the information that David had threatened Paula.

In their petition, the Waltons specifically allege the following:

• David first threatened to kill Paula during the 2023–2024 year at the school lunch table. Morphis, the school principal, was made aware of this threat.

• In August 2025, while Paula was riding the school bus, David again threatened to kill Paula in a note he had passed to her. Another student told the bus driver, who collected the note, along with other notes David had passed to Paula. The bus driver turned the notes in to the school. Mariah Walton spoke with Borchert, the assistant principal, on the phone, and Borchert informed Mariah that she had spoken to David, who admitted telling Paula "to 'go kill herself.'"

• After the school-bus incident, the school put into place a "stay away plan" that required Paula to stay away from David. The Waltons reported the incident to the City of Sanger police, who forwarded the information to

14

Denton County. Denton County then forwarded the information to the "school law enforcement department."

• The day after making their report to the Sanger police, the Waltons filed a police report with the elementary school's school resource officer, who forwarded the report to Picha, the Sanger ISD Chief of Police. Picha spoke with Mariah and told her that he had interviewed David, collected the notes that the bus driver had obtained from Paula, and filed a police report.

• A little over a week later, the Waltons met with Morphis, Borchert, Picha, Sanger ISD Superintendent Tommy Hunter, and Assistant Superintendent Jennie Flaa. Borchert again indicated that David told her he had told Paula "to kill herself." The Waltons requested that David be removed from the bus, but the ISD Employees refused.

• In October 2025, after hiring an attorney, the Waltons "requested a full bullying investigation for each incident involving" David. Paula and another student were pulled out of class to give written statements. The other student's parent told Mariah that her child had written that on October 20, 2025, she had overheard David say to a group of children that he was going to kill Paula. According to that student's mother, the school had tried to get the student to change her statement, and Hunter had reached out to the mother, saying, "I'm begging you and pleading to you to let us ask [the other student] one more question about her statement." According to the Waltons, no one at the school ever made them aware of this October 2025 alleged threat to Paula.

• In a November 2025 conference between the Waltons' counsel and Sanger ISD's counsel, Sanger ISD's counsel "stated that the school would not take any steps to put any safety measures in place, including removing [David] from the bus that [Paula] rides home from school on, until the school could 'clarify' the timeline of the threats and determine when exactly the threat was made."

At the hearing, the Waltons' counsel argued that the ISD Employees had "failed to carry out their ministerial duties by implementing a threat safety plan as required by the Texas Education Code" and that the Waltons were seeking relief ordering the ISD Employees to "enact these particular safety measures, which would

15

be to remove [David] from this campus and place him at a different campus."[7]  The ISD Employees countered that Sanger ISD had already implemented the threat assessment and safety plan mandated by Section 37.115 by performing the requested bullying assessment and that the Waltons were effectively challenging the way in which the ISD Employees had chosen to implement the threat assessment and safety plan in this particular situation.  The ISD Employees contended that they have discretion in "how they look into these cases, how they follow those policies, [and] whether or not they're going to initiate an investigation under those policies."

The Waltons responded by clarifying that their claim is that the ISD Employees have a ministerial duty according to Section 37.115 to "implement the safety plan" by taking action when any kind of threat is made, including reporting to the superintendent that the employee made an assessment of the threat.[8]  According to the Waltons, the ISD Employees failed to perform the required threat assessment under Section 37.115 because they performed one under a different Education Code section[9] instead.  Their counsel argued that the ISD Employees had failed to follow

---

[7]The Waltons provided no authority to the trial court requiring such relief under Section 37.115, nor do they provide any to this court.

[8]When asked by the trial court what the point would be of ordering that a threat assessment report be made to the superintendent when the superintendent had already been in a meeting about the matter, the Waltons' counsel stated, "[T]hey have failed to even assess the threat."

[9]Education Code Section 37.0832 addresses what components must be included in a school district's required policy regarding bullying.  Tex. Educ.

the Sanger ISD Board policy promulgated pursuant to Section 37.115: "So the implementation part is what we're stating they did not do. They have established – they do, they have a threat assessment team. What they failed to do is implement the threat assessment team in this particular situation." Counsel ultimately asked the trial court "to enforce the district's policies."

**E. Analysis**

When the crux of a purported ultra vires claim involves what a statute required of the defendant, we must first consider the statute's proper construction. *Image API, LLC*, 691 S.W.3d at 836 n.15; *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015). We have found no authority construing Section 37.115. We therefore look to familiar principles to construe that section, interpreting it according to its plain language, in context. *See State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020).

Section 37.115(f) requires a school's threat assessment team to conduct a threat assessment for "assessing and reporting individuals who make threats of violence." Tex. Educ. Code § 37.115(f)(1)(A). That threat assessment includes "gathering and analyzing data to determine the level of risk and appropriate intervention." *Id.* § 37.115(f)(1)(B). After performing the threat assessment and determining that the student "poses a serious risk of violence to self or others," the team must "immediately report the team's determination to the superintendent" and the

Code § 37.0832 (including, in Subsection (c)(7), the requirement to establish procedures for "investigating a reported incident of bullying").

17

student's parent or "person standing in parental relation to the student." *Id.* § 37.115(h).

Subsection (f) is multi-faceted:  it requires the team to assess a threat made by an individual and to report the individual in accordance with the policy promulgated pursuant to Section 37.115(c).  It also requires the team to consider what interventions might be necessary, including interventions to assist the student who made the threat.  As evidenced by its language and context, the purpose of the statute is to enhance school safety by requiring that school districts do not simply dismiss threatening conduct but rather investigate such conduct, determine its seriousness, and provide appropriate intervention to the person engaging in that conduct, if necessary, in an attempt to prevent future safety concerns.[10]

Sanger ISD's policy promulgated pursuant to Section 37.115 requires the team conducting a threat assessment to make "an individualized assessment based on reasonably available information to determine whether the individual poses a threat of violence or poses a risk of harm to self or others and the level of risk."[11]  The team

---

[10]Section 37.115 was initially passed after the Senate Select Committee on Violence in Schools and School Security was appointed "following the tragedy that occurred at Santa Fe High School."  S. Comm. on Educ., Bill Analysis, Tex. S.B. 11, 86th Leg., R.S. (2019).  The "Author's/Sponsor's Statement of Intent" indicates that "[t]he committee studied methods to reduce the likelihood of school violence and reduce security threats, harden facilities, and facilitate mental health resources to schools."  *Id.*

[11]Although it is unclear if the trial court considered the judgment's attachments when making its ruling, we note that the page entitled "Threat Assessment When

18

must then implement "appropriate intervention and monitoring strategies, *if the team determines an individual poses a threat of harm to self or others*." [Emphasis added.]

The Waltons do not identify the threat assessment team responsible for Paula's school, nor do they allege that the ISD Employees are members of that team. But even if they had so alleged, Section 37.115—and Sanger ISD's policy promulgated pursuant to Section 37.115—provides the team members with discretion, once they have made an assessment, to determine (1) whether the person who has been reported to them poses a risk of violence or threat of harm to others and (2) what interventions need to be made, if any. And that is what the Waltons allege happened here: the ISD Employees investigated David's alleged threats and had determined as of the time suit was filed that only a stay away plan was needed unless they could clarify the timeline of the alleged threats. The Waltons do not explain how the threat assessment ordered by the trial court would produce a different result or how the facts they alleged rendered the assessment and investigation that was performed insufficient. We agree with the ISD Employees that the essence of the Waltons' complaint is not that the ISD Employees failed to assess David's alleged threats but that the Waltons disagree with the outcome of the assessment that was made.

Student Makes Threat to Hurt Others/the School" provides that the first step is "Administrator talks to student & witnesses then determines if a formal team threat assessment needs to be done." If the administrator does not decide that a formal team assessment needs to be done, then the process requires: "Administrator calls parent to discuss the situation[.] Has counselor visit with the student; Parents are provided with community-based supports."

Because the facts pleaded by the Waltons do not affirmatively show that the ISD Employees failed to comply with a ministerial duty by failing to make a threat assessment according to Education Code Section 37.115, we conclude that the trial court erred by denying the ISD Employees' plea to the jurisdiction. *See, e.g.*, *Schroeder v. Escalera Ranch Owners' Ass'n, Inc.*, 646 S.W.3d 329, 334–36 (Tex. 2022); *Dubose v. Nelson*, No. 09-25-002230CV, 2026 WL 1175152, at *8 (Tex. App.—Beaumont Apr. 30, 2026, no pet. h.) (mem. op. on reh'g); *Gonzalez v. Harris Cnty. Sheriff's Civ. Serv. Comm'n*, No. 01-23-00411-CV, 2025 WL 1033748, at *7 (Tex. App.—Houston [1st Dist.] Apr. 8, 2025, no pet.) (mem. op.); *Leonard v. City of Burkburnett*, No. 02-22-00266-CV, 2023 WL 8940816, at *15 (Tex. App.—Fort Worth Dec. 28, 2023, no pet.) (mem. op. on reh'g); *Morath v. Kingsville Indep. Sch. Dist.*, 710 S.W.3d 918, 926 (Tex. App.—15th Dist. 2025, no pet.); *Brown v. Daniels*, No. 05-20-00579-CV, 2021 WL 1997060, at *16–22 (Tex. App.—Dallas May 19, 2021, no pet) (mem. op.). Additionally, because the facts pleaded by the Waltons show that the ISD Employees—assuming they are part of the threat assessment team appointed under Section 37.115 and Sanger ISD's policy—had performed an investigation and evaluated what action should be taken in response to David's alleged threats, we conclude that they are not entitled to an opportunity to replead. *See generally Clint Indep. Sch. Dist.*, 487 S.W.3d at 559.

Accordingly, we sustain the ISD Employees' second issue.

## IV. CONCLUSION

Having sustained the ISD Employees' dispositive second issue, we reverse the trial court's order, and we dismiss the Waltons' suit for lack of jurisdiction. *See* Tex. R. App. P. 43.2(c).

/s/ Dana Womack

Dana Womack
Justice

Delivered: July 9, 2026